IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | No. 11 CR 0750 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| JASON CORREA and | ) | |
| SAUL MELERO | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are Defendants Jason Correa and Saul Melero's joint motion to reconsider [116] the Court's October 17, 2013 Opinion and Order [110] denying Defendants' joint motion to suppress evidence [74, 75]. For the reasons below, Defendants' motion [116] is denied.

**I.     Background**

The relevant facts for the purpose of Defendants' motion to reconsider are as follows: On October 19, 2013, DEA agents conducted surveillance of a meeting between a confidential source ("CS") and two unknown males ("UM1" and "UM2") in a restaurant at 53rd and Pulaski in Chicago, Illinois. The men swapped cars when they left the restaurant, and DEA agents followed UM1 and UM2 until they drove into a parking garage at the intersection of 18th and South Prairie. After 25 minutes, UM1 and UM2 exited the parking garage attached to 1717 South Prairie, returned to 53rd and Pulaski where the CS was waiting, and the parties switched back to their original vehicles. DEA agents then met with the CS and discovered $500,000 cash in the vehicle that had not been there prior to the car swap, while other DEA agents followed UM1 and UM2 in their red GMC Canyon truck to a residence in Lyons, Illinois.

On October 27, 2013, while surveilling the Lyons residence, DEA agents observed UM2 leave the residence in the same red GMC truck. Agents followed UM2 to a grocery store at the intersection of Canal Street and Roosevelt Road. There, UM2 parked next to a silver Jeep Cherokee and met another unknown male, later identified as Defendant Correa, at the Starbucks inside the store. When the two men left the store, UM2 pulled a multi-colored bag from the red Canyon truck and handed it to Correa, who placed it in his Jeep. Correa then drove away in the Jeep, heading south on Canal Street. DEA agents followed Correa until Correa turned left onto 18th Street without using his turn signal, at which point the agents pulled over Correa at 18th and Wabash. After Correa consented to a search of the Jeep, agents recovered a bag of cocaine inside the vehicle. Agents then took Correa into custody and transported him to the DEA office, where he was given his Miranda warnings.

During the search of Correa's vehicle, Special Agent Thomas Asselborn ("SA Asselborn") discovered a bag on the front passenger seat, containing four garage door openers, three sets of keys, and four cell phones. SA Asselborn then took the bag and drove the few blocks from the scene of the traffic stop to the garage at 1717 South Prairie, where agents had observed UM1 and UM2 with $500,000 in the CS's car emerge eight days prior. When he arrived, SA Asselborn pressed the button on each of the four garage door openers to see if any worked at the address. When none of them opened the garage, SA Asselborn spent 10-15 minutes testing the openers on the garages of nearby buildings until one of them activated the garage door at 1819 South Michigan Avenue, a ten-story apartment and condominium building. SA Asselborn then called two other Specials Agents, Barnum and Loonan, and arranged to meet them the building's front entrance.

The Special Agents gained access to the lobby using a key fob from the bag. Inside the lobby, SA Asselborn tested another key on the residents' mailboxes, until he found its match in the mailbox for unit 702. Believing this to be Correa's home, SA Asselborn contacted DEA Group Supervisor James Laverty, who was with Correa at the time in an interview room at the DEA office. Laverty asked Correa if the agents could search unit 702, and Correa consented. SA Asselborn then opened the door to the unit using another key from the bag, at which point the agents discovered a plethora of contraband, including marijuana, methamphetamine, Ecstacy, a .32 caliber semiautomatic handgun, an assortment of drug packaging materials, and various documentation belonging to Saul Melero. Agents showed a photo of Correa to neighbors, who not only identified Correa as a resident of the unit, but also informed the agents that the unit's other resident – who turned out to be Melero – was standing outside the building. Laverty then arrested Melero on the street.

In their joint motion to suppress [74, 75], Correa and Melero challenged (1) the agents' authority to pull over Correa and search his car, (2) SA Asselborn's use of the garage door openers and keys to identify unit 702 as Correa's home, (3) the Agent's authority to search the unit itself, and (4) the agent's authority to lawfully arrest Melero outside of the building. For the reasons discussed in the Court's October 17, 2013 Opinion and Order [110], the Court denied Defendants' motion in its entirety. Defendants' now ask the Court to reconsider its ruling concerning SA Asselborn's use of the garage door opener to locate 1819 South Michigan as Correa's residence, which they contend was a search that required a warrant.

**II.     Analysis**

In denying Defendants' motion to suppress, the Court relied on *U.S. v. Concepcion*, 942 F.2d 1170 (7th Cir. 1991), a case with an analogous set of facts to those at issue here. See [110],

at 11-13.  In *Concepcion*, DEA agents arrested the defendant and seized his keys.  942 F.2d. at 1171.  After the defendant was taken into custody, agents saw the name "Concepcion" on the mailbox of a nearby apartment building.  *Id.*  They tested Concepcion's keys, one of which worked on the door to the lobby.  *Id.*  Inside the building, the agents tested his other keys until they found a match to apartment 1C.  *Id.*  They opened the door an inch, but immediately closed it and locked it without looking inside.  *Id.*  Having identified Concepcion's residence, the agents sought and obtained his consent to search the unit.  *Id.*  Concepcion later challenged the lawfulness of the actions taken by the agents that allowed them to establish the connection between Concepcion and the unit.  *Id.*

In affirming the district court's determination that the agents' actions did not offend the Fourth Amendment, the Seventh Circuit agreed that "a tenant has no reasonable expectation of privacy in the common areas of an apartment building" because "the area outside of one's door lacks anything like the privacy of the area inside" and "Concepcion had no expectation that the goings-on in the common areas would remain his secret."  *Id.* at 1172.  Therefore, the agents' use of the keys to enter the locked building was lawful; because the act did not implicate the defendant's protected privacy interests, it was not a "search" within the meaning of the Fourth Amendment.  *Id.*  A harder question for the Seventh Circuit concerned the lawfulness of the agents' use of Concepcion's key to his apartment door, because a "keyhole contains *information* – information about who has access to the space beyond."  *Id.* (emphasis in original).  Because the information is not accessible to strangers, the Court concluded that the agents' use of the key to Concepcion's unit to confirm its match did constitute a "search" for purposes of the Fourth Amendment.  *Id.*  However, the Seventh Circuit determined that, because the privacy interest at

4

issue was so small, the agents did not need a warrant (or even probable cause) to conduct this search. *Id.* at 1173.

In light of *Concepcion*, the Court concluded that SA Asselborn's actions did not offend Correa or Melero's Fourth Amendment rights. See [110], at 12-13. Asselborn's use of the key fob to enter the lobby was not a "search," because Defendants did not have a reasonable expectation of privacy in the common areas of the 10-floor, 60-80 unit condo building at 1819 South Michigan in which they rented a unit. And Asselborn's use of Correa's key in the lobby's mailboxes to determine its match to the mailbox for unit 702 – at most – was a "search" in the same way that the agents' use of Concepcion's keys to unit 1C was a search, and thus did not require a warrant. Finally, Asselborn's initial use of the garage door opener at 1819 South Michigan to identify it as Correa's building did not offend the Constitution, because – as *Concepcion* made explicitly clear – Correa did not have a reasonable expectation of privacy in the building's lobby and common areas, including the common garage. And even if Correa did have some reasonable expectation of privacy in the garage (for example, since it may be more difficult to access than the lobby and may not be accessible to every resident of the building), Asselborn's act of pressing the garage door button to open and close the door to confirm the match was no more invasive than the *Concepcion* agents' identical act on Concepcion's apartment door. In other words, Asselborn's use of the garage door either constituted a "search" that was so minimally invasive as to not require a warrant or it was not a search at all.

Defendants hardly address *Concepcion* in their motion to reconsider, but their arguments, at least implicitly, seek to exploit the primary factual difference between that case and this one. Whereas in *Concepcion* the agents located the defendant's apartment building by visually inspecting the premises (which led to the discovery of the defendant's name on the building's

5

exterior), Asselborn used a garage door opener to do so.  Defendants argue that two recent Supreme Court cases – *United States v. Jones*, 132 S. Ct. 945 (2012), and *Florida v. Jardines*, 133 S. Ct. 1409 (2013) – compel the "natural conclusion" that Asselborn needed a warrant before he could lawfully use the assistance of this technology to hunt for Correa's building.  The Court disagrees.

In *Jones*, FBI agents installed a GPS device on the undercarriage of a criminal suspect's automobile and then tracked it over the course of the next 28 days, gathering more than 2,000 pages of data concerning narcotics trafficking, including the location of a stash house.  132 S. Ct. at 948.  First noting that the Fourth Amendment includes protection from unreasonable searches of our "effects," the Supreme Court held that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search,'" because "[t]he Government physically occupied private property for the purpose of obtaining information."  *Id.* at 949.

Defendants argue that Asselborn "physically occupied" Correa's garage door openers in the same way that the agents occupied Jones's car.  But *Jones* differs from the facts of this case in a critical respect.  There, the agents "searched" an individual's property – continuously, for 28 days – that was not in their possession.  In Correa's case, even if Asselborn "searched" the garage door openers by pressing their buttons to see if they worked, he did so after lawfully seizing the garage door openers as evidence.  For that reason, this case is much more like *United States v. Flores-Lopez*, 670 F.3d 803 (7th Cir. 2012), a case decided by the Seventh Circuit after *Jones*, and on facts more analogous to Correa's case.

In *Flores-Lopez*, officers arrested a defendant at the scene of a drug sale and lawfully seized three cell phones, two from his truck and one from his person.  670 F.3d at 804.  At the

scene, an officer searched each cell phone to determine their telephone numbers, which the government later used to subpoena the phones' call histories for use as evidence of a conspiracy. *Id.* The defendant argued that the search of his cell phones was unreasonable, because the officer conducted it without a warrant. *Id.* at 805. Citing *United States v. Rodriguez*, 995 F.2d 776, 778 (7th Cir. 1993) – a case which ruled that police did not need a warrant to flip through (*i.e.,* search) an address book found on a suspect to determine his address – the Seventh Circuit held that no warrant was necessary to perform the functional-equivalent search of a cell phone for its number. 670 F.3d at 807. The Seventh Circuit reasoned: "If police are entitled to open a pocket diary to copy the owner's address, they should be entitled to turn on a cell phone to learn its number. If allowed to leaf through a pocket address book, as they are, they should be entitled to read the address book in a cell phone." *Id.* *Flores-Lopez* therefore suggests that the Fourth Amendment analysis does not change simply because an ordinary item is searched in one instance and a technologically advanced version of that item is searched in another.

This guidance supports application of *Concepcion* to Asselborn's use of the garage door opener (in essence, an electronic key). And if there was any doubt as to the continuing force of *Concepcion* after *Jones,* the Seventh Circuit nixed it by saying:

> But was there any *urgency* about searching the cell phone for its phone number? Yet even if there wasn't, that bit of information might be so trivial that its seizure would not infringe the Fourth Amendment. In *United States v. Concepcion*, 942 F.2d 1170, 1172-73 (7th Cir. 1991), police officers tested the keys of a person they had arrested on various locks to discover which door gave ingress to his residence, and this we said was a search – and any doubts on that score have been scotched by *United States v. Jones*, 132 S. Ct. 945, 949 (2012), which holds that attaching a GPS device to a vehicle is a search because "the Government physically occupied private property for the purpose of obtaining information." But we went on to hold in *Concepcion* that a minimally invasive search may be lawful in the absence of a warrant, even if the usual reasons for excusing the failure to obtain a warrant are absent, a holding that . . . survives *Jones* . . . .

7

*Flores-Lopez*, 670 F.3d. at 806-07.  *Jones*, therefore, does not disturb *Concepcion*, the holding of which – if anything – is even more instructive as to Correa and Melero's case when read in conjunction with *Flores-Lopez*.

After *Concepcion*, it seems clear that Asselborn lawfully could have tested a metal key (as opposed to an electronic door opener) on the garage door at 1819 South Michigan (and the other buildings nearby). If the garage is a common area, the act of using the key is not a search. And if Defendants (somehow) had as much of an expectation of privacy in the garage as in their condo, that act – though technically a search – still would not require a warrant because of its minimal invasiveness. The Court sees no difference – particularly after *Flores-Lopez* – between Asselborn's hypothetical use of a metal key and his actual use of an electronic one, other than the speed at which he could test the doors. Although the garage door opener made it slightly faster to locate the correct building – in the same way that finding a telephone number in a cell phone is faster than manually searching an address book – the underlying rationale for permitting this warrantless "search" (assuming, *arguendo*, that it was one) remains the same. As the Seventh Circuit reasoned:

> The agents properly arrested Concepcion without a warrant, and they properly searched his pockets and seized his keys without a warrant. Why then should a warrant be necessary to learn whether the keys in Concepcion's possession operate a lock? . . . Where [Concepcion] lived was something the agents could have ascertained in many other ways. They could have looked him up in the telephone book or conducted a computer search of drivers' licenses. If they did not find him (or if they found too many persons of the same name), they could have visited the landlord and asked who lived in apartment 1C. Instead of asking the landlord who lived there, they could have shown the landlord the key in their possession and asked the landlord to compare it with the key issued to the tenant. So too the agents could have followed Concepcion around to learn his residence.

*Concepcion*, 942 F.2d at 1142-43.

The same can be said here regarding Asselborn's quest for Correa's condo building. Although Asselborn did not know Correa's exact address, he believed it to be one of the buildings immediately surrounding 1717 South Prairie, where agents observed Correa depart in the CS's red Canyon truck with $500,000 just eight days earlier. Instead of testing the garage door opener on the surrounding buildings, Asselborn – like the agents in *Concepcion* in their search for the defendant's apartment – could have done any number of things to ascertain which building contained Correa's residence. He could have shown the garage door opener to the doorman (or the building manager or a resident leaving the garage) at each building to see if that same type of opener is used in that particular building's garage. Or instead he could have paid no attention to the garage door openers and gone directly to the front doors of the buildings to see if the fob from the bag of keys worked.[1] Regardless, Asselborn could have determined 1819 South Michigan to be Correa's address without a prohibitive amount of additional effort.

Defendants citation to *Jardines* does not alter this conclusion. In *Jardines*, the Supreme Court held that the use of a trained police dog to sniff and explore the front porch of a home to determine the existence of marijuana inside constitutes a search for the purpose of the Fourth Amendment, such that a warrant or consent from the home owner is required before officers can lawfully conduct this activity. 133 S. Ct. at 1415-16. *Jardines* actually undercuts Defendants' argument. There, the conduct constituted a search because "the detectives had all four of their feet and all four of their companion's firmly planted on the constitutionally protected extension of Jardines' home" (*i.e.,* the curtilage). *Id.* at 1415. The detectives violated the Constitution, because they lacked a warrant or some other justification to conduct that search. *Id.* Here, none of those concerns are implicated because, as *Concepcion* instructs, an apartment building is a

---

[1] Notably, Defendants do not challenge Asselborn's use of the fob (as distinct from a metal key) to enter the lobby of the building, presumably because they see no real distinction between the use of a metal key and an electronic one. As noted, neither does the Court, which is why *Concepcion* controls here.

9

different animal than is a home. There is no curtilage. There is no constitutionally protected extension of the apartment into the building. In fact, a resident's reasonable expectations of privacy are so greatly reduced that an agent does not offend the Constitution even by gaining entrance to and exploring the building's common areas and hallways or by testing keys in the locks of the apartments themselves.

Defendants' citations to other cases involving single family homes – *United States v. Kyllo*, 533 U.S. 27 (2001), *United States v. Karo*, 468 U.S. 705 (1984), and *United States v. Knotts*, 460 U.S. 276 (1983) – are likewise unpersuasive. Unlike here, those cases all involved the government's efforts to monitor and/or uncover the activity taking place within an individual's home. In *Karo*, the government, through a consenting confidential informant, placed a monitoring device in a barrel of ether, which the government believed was ordered to manufacture cocaine. 468 U.S. at 708. The monitor allowed the government to track the location and movement of drug activity, information which enabled agents to obtain a search warrant, and so the defendant challenged the monitor as violative of the Fourth Amendment. *Id.* at 710. The Supreme Court ruled that neither the installation of the monitor, nor its invasion into the defendant's home (by way of the barrel), were problematic. *Id.* at 712. The Court held that the monitoring of the activity inside the home, however, was unconstitutional. *Id.* at 713. *Knotts* also involved government installation of a monitoring device in a barrel (of chloroform instead of ether), like in *Karo* installed prior to the defendant's receipt of the barrel and with the consent of the then-owner. 468 U.S. at 277. But unlike in *Karo*, the government only tracked the device until it arrived at its destination, a drug laboratory. *Id*. Consequently, the Supreme Court held that no search (and thus no Fourth Amendment violation) occurred, since the activities that were tracked (the movements of the car that contained the barrel) could have been

observed by the naked eye and, therefore, did not invade a legitimate expectation of privacy. *Id.* at 285. Finally, in *Kyllo*, the Supreme Court determined that the government's use of a sense-enhancing thermal imaging device to glean information about the illegal activities inside a home constituted a "search" for the purposes of the Fourth Amendment. 533 U.S. at 34. Without a warrant, therefore, this activity violated the resident's constitutional rights. *Id.* at 39.

The Court fails to see how these cases help Correa and Melero. Defendants argue that the use of the garage door opener is akin to the government's use of the beeper in *Karo* and the thermal imaging technology in *Kyllo*. But those cases cut the other way. As mentioned above, the Supreme Court drew a critical distinction between government conduct that monitors the activities occurring inside the home (something that the government did not do here) and those that do not. Of the three cases cited above, the present case is most similar to *Knotts*, where the government used a tracking device to determine the defendant's address. Defendants cite this case, it seems, to suggest that *Knotts* established that the only acceptable means by which the government could have determined Correa's address was either by using a permissible tracking device (*i.e.,* one installed with consent, as in *Karo* and *Knotts*, rather than by physical intrusion as in *Jones*) or by following him until he arrived at the garage itself, rather than stopping him two blocks short of his destination the way they did. But the Court need not look further than *Concepcion* to reject that premise, and *Knotts* really only serves to highlight that the present case is far different from the others that the Defendants cite.

In the end, *Concepcion* controls here. But rather than address the *Concepcion* case head-on, Defendants attempt to amalgamate an assortment of unrelated cases in the hopes that the Court will abandon Seventh Circuit precedent and rule in their favor. For all of the reasons stated above, the Court declines Defendants' invitation.

### III. Conclusion

For the reasons stated above, Defendants' motion to reconsider [116] is denied.

Dated: March 14, 2014

_____
Robert M. Dow, Jr.
United States District Judge